UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RACHELLE M. ELLIS,

                Plaintiff,

     -vs-


CAROLYN W. COLVIN, Commissioner,
Social Security Administration

                Defendant.

_____

**DECISION AND ORDER
No. 1:11-CV-0947(MAT)**

## I.   Introduction

Rachelle M. Ellis ("Plaintiff"), represented by counsel, brings this action pursuant to Title II of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner")[1] denying her application for Disability Insurance Benefits ("DIB"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure

## II.  Procedural History

### A.   Initial Application and First Administrative Hearing

Plaintiff applied for DIB on June 14, 2004, T.62- 66, alleging disability based upon shoulder and neck injuries, headaches, and

---

[1]
    Carolyn W. Colvin has replaced Michael J. Astrue as the Commissioner of Social Security. She therefore is automatically substituted as the defendant in this action pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

anxiety, with an onset date of April 20, 2003. This application was denied on February 4, 2005, after which she requested a hearing which was held before Administrative Law Judge Robert T. Harvey ("ALJ Harvey") on April 10, 2006. ALJ Harvey issued an unfavorable decision on September 11, 2006, T.213-30.

**B.    First Remand and Second Administrative Hearing**

The Appeals Council reversed and remanded ALJ Harvey's decision on March 21, 2007. T.232-34. ALJ Harvey held a second hearing on October 16, 2007, and issued an unfavorable decision on October 24, 2007, T.13-25, which was affirmed by the Appeals Council on October 22, 2008.

**C.    First Federal Proceeding and Second Administrative Remand**

On September 9, 2008, Plaintiff filed a pro se complaint in this Court. See Ellis v. Commissioner of Social Sec., 1:08-cv-00470-RJA-LGF (W.D.N.Y.). On March 31, 2009, the Commissioner and Plaintiff entered into a stipulation to remand her case for further administrative proceedings. See T.364-73; Docket No. 11 in Ellis, 1:08-cv-00470-RJA-LGF (W.D.N.Y. Mar. 31, 2009).

Based upon the stipulation, the Appeals Council issued another remand order on March 30, 2010, T.374-78, noting the case already had been remanded once "to further evaluate the claimant's residual functional capacity as it related to her ability to stand and/or walk as well as to obtain input from a vocational expert to determine the impact of reaching and handling restrictions on a

residual functional capacity for less than a full range of sedentary work." At the second hearing, ALJ Harvey had obtained testimony from Jeremiah O'Sullivan, M.D., a medical expert, who testified that Plaintiff met an obsolete musculoskeletal listing (1.03B). T.376. The Appeals Council noted that ALJ Harvey had

> discounted Dr. O'Sullivan's opinion and surmised that he must have been referring to the current Listing 1.04(B) due to the nature of the claimant's severe spinal cervical stenosis, spinal arachnoiditis and severe arthritis of the neck. However, it is not apparent that Dr. O'Sullivan meant Listing l.04(B) because he never indicated the claimant suffered from spinal arachnoiditis. The certified transcript shows that the Administrative Law Judge inadvertently questioned Dr. O'Sullivan about Listing l.03(D), a section that does not exist.

T.376 (internal citations to record omitted). Due to the ambiguity generated by Dr. O'Sullivan's testimony, the Appeals Council noted, this Court had ordered the Administration to remand the case. Id.

The Appeals Council also indicated that further analysis of consultative examiner Dr. Sirotenko's opinion was needed "to properly assess the claimant's ability to reach in all directions, including overhead." T.377. As the Appeals Council noted, Dr. Sirotenko concluded that Plaintiff "should avoid lifting objects over her head to prevent cervical load." T.159. Although ALJ Harvey had addressed some of Dr. Sirotenko's findings, there was "no rationale about this specific finding, which was not included in the residual functional capacity." T.377.

-3-

The Appeals Council indicated that this omission affected the series of hypothetical questions posed to the VE. Furthermore, ALJ Harvey's RFC, T.21, which included occasional reaching and handling limitations, was inconsistent with the questions that he posed to the VE. T.377. Moreover, the jobs cited to support the unfavorable decision, T.24, were based on a frequent ability to use one's upper extremities to reach and handle. T.377 (citing T.330-31). The Appeals Council accordingly issued a set of instructions to the new ALJ, for the purpose of correcting the above-discussed errors. See T.377-78.

### D.    Third Administrative Hearing

Dennis A. Clary, Esq. ("Attorney Clary"), was substituted for Jeffrey Piazza, Esq., who had represented Plaintiff previously. Attorney Clary wrote to the new ALJ, Timothy M. McGuan ("ALJ McGuan"), and proposed that he contact medical expert Dr. O'Sullivan, either to appear at a hearing or to perform a file review and determine whether Plaintiff meets any of the current musculoskeletal listings based upon his previous findings. T.382. Attorney Clary also submitted a pre-hearing memorandum on August 11, 2010. T.401-02, along with submitted updated records from Dr. Bennett; Stephen Caprow, D.C.; and John Pollina, M.D. T.401.

At the commencement of the third hearing, the following colloquy occurred between Attorney Clary and ALJ McGuan:

-4-

ATTY: Just, for clarification's sake, the [A]ppeals [C]ouncil remand indicates, as far as they're concerned, the necessity for obtaining evidence from a medical expert.

ALJ: Right, and the medical expert that we only have is Dr. O'Sullivan and I will not call him. He finds everybody meets the listing, I think that's based on my experience with him, it's unreasonable.

ATTY: He's the only medical expert this is anymore?

ALJ: Right. So we're pretty much limited to him and I won't call him. Makes no sense—and I just—that's my choice, if you want to make any objection to it, do so on account of outlying [sic] your judgment.

ATTY: Well, I had—I know I sent you a letter with regard to that prior to the hearing.

ALJ: Mm-hmm.

ATTY: I—at this point, don't take any opinion position on that. I don't know if the appeals council will or not. That's—

ALJ: Well, that's up to them if—

ATTY: Up to them.

ALJ: If this is denied again, but I think he just is not—I don't think he understands the listings at all and—you could ask, I've done at least 20 cases with him and they're [sic] all been disabled people that met listings and that was just impossible. Okay, so any other questions?

T.544-46.

Plaintiff appeared in person and testified. Vocational expert Donald Schader testified via telephone. After the hearing, ALJ McGuan issued an unfavorable decision on September 23, 2010. Plaintiff requested review from the Appeals Council, which declined

jurisdiction on October 17, 2011. T.335-38. ALJ McGuan's decision therefore became the Commissioner's final decision.

**D.   Second Federal Proceeding**

Attorney Clary timely filed a complaint on Plaintiff's behalf in this Court. Both Plaintiff and Defendant have filed motions for judgment on the pleadings.

**III. Summary of the Administrative Record**

**A.   Medical Evidence**

**1.   Medical Records During the Relevant Period (April 20, 2003, to June 30, 2005)**

On April 22, 2003, two days after her motorcycle accident, Plaintiff underwent an x-ray of her cervical spine which revealed mild degenerative changes. T.116. On May 16, 2003, Plaintiff began a course of physical therapy for her neck and left shoulder pain. T.118-36, 138-48.

On June 3, 2003, Plaintiff had a magnetic resonance imaging ("MRI") scan of her cervical spine which revealed degenerative changes at the C3-4 to C6-7 disc spaces, with posterior spondylitic ridging which is narrowing the neural foramina, most prominently on the right at C5-6 and bilaterally at C6-7. T.117. The spinal canal was relatively narrow at C5, with greater narrowing at C4-5 and C5-6. In addition, there is effacement of the CSF posterior to the spinal cord at C5 from a buckling or hypertrophy of the intraspinal ligaments. The dural sac is narrowed to approximately 9 mm

(anterior-posterior measurement), indicating spinal stenosis. T.117.

On June 11, 2003, neurosurgeon Gregory J. Bennett, M.D. examined Plaintiff and reviewed her recent MRI, which he described as showing multilevel disc degeneration, with minimal spinal cord compression. T.137. On examination, Plaintiff had moderate muscle spasm and tenderness of the trapezius muscle. T.137. Dr. Bennett continued her on Flexeril, Naprosyn, and hydrocodone, and added Lorcet. Dr. Bennett stated that she was unable to work, but he anticipated an eventual return to work. T.137.

On August 1, 2003, Plaintiff returned to see Dr. Bennett. T.150, 526. Plaintiff felt "somewhat improved" with weekly P.T. T.150. Dr. Bennett added home cervical traction, twice a day. Plaintiff was unable to work, but he anticipated that she would eventually return to light work. T.150. During a September 26, 2003, follow-up visit, Dr. Bennett reiterated that although she could not work at present, he anticipated that she would eventually return to light work. T.167.

From May 16, 2003, through November 3, 2003, Plaintiff attended physical therapy on a one-time per week basis, for a total of 17 treatment sessions, having canceled 6 appointments due to illness of her dog and being sick herself. Treatment sessions consisted of moist

heat to Plaintiff's bilateral cervical, upper back, and shoulder areas in conjunction with intermittent cervical

traction of 12 pounds followed by ultrasound with stimulation, myofascial release, and stretching of the upper trapezial musculature. Plaintiff tolerated treatment sessions well but reported plateauing as far as pain level and functional level since the end of September 2003. Plaintiff continued to report residual numbness into her left hand and clicking in the acromioclavicular joint with horizontal adduction and abduction; most of her pain was localized in the anterolateral cervical region with continued spasming and swelling. T.118. Although Plaintiff continued to report pain and some spasms of the shoulder, she stated that she experienced an increased functional use of the arm. She continued to report numbness into the left leg along the

posterolateral aspect which began on the first weekend in September. T.118. Plaintiff reported that she could sit for 20 to 25 minutes at a time and could grip 16 kg of pressure. T.119. Plaintiff's prescription for physical therapy had expired, and she was encouraged to continue doing exercises at home. T.119. On November 17, 2003, Dr. Bennett discharged her from physical therapy. T.119.

An April 23, 2004, x-ray of Plaintiff's left shoulder revealed fairly limited rotation of the humeral head. Lack of rotation can

be seen posterior dislocation. There were no bony abnormalities, fractures, or lesions. T.149.

On September 25, 2004, Plaintiff was examined by consultative physician George Sirotenko, D.O. T.157-60. He noted that she utilizes a cervical collar on an as needed basis for her neck and shoulder pain, which she described as having a "dull toothache-like quality, moderate relieved by physical therapy and a pain clinic." T.157. The pain radiates in the posterior aspect of the left shoulder although there is no upper or lower extremity radiculopathy.

Dr. Sirotenko noted that Plaintiff had a history of anxiety and depression, and was seeing a therapist and was taking Celexa which improved her symptoms. T.157. For pain, she takes Robaxin, 750 mg, 4 times a day; and hydrocodone 10-500, 1 every 4 to 6 hours. She uses Atrovent, 3 puffs 4 times a day for allergy-induced asthma.

Plaintiff reported that she was able to do the cooking, cleaning, laundry, and shopping. T.158. She was able to bathe and dress herself. She watches television, listens to the radio, reads, and spends time with her family. T.158.

On physical examination, with regard to fine motor activity of the hands, Dr. Sirotenko noted that hand and finger dexterity are intact; grip strength is -5/5 bilaterally; and Tinel's sign was negative bilaterally. T.158. With regard to the upper extremities,

shoulder abduction right is 120 degrees, left is 110 degrees; internal rotation right is 30 degrees, left is 20 degrees; external rotation right 70 degrees, left is 40 degrees. She has tenderness over the left anterior shoulder to palpation. Strength is -5/5 in the upper and lower extremities. T.158.

In regard to her cervical spine, forward flexion is 30 degrees, extension is 30 degrees, and lateral rotation is 40 degrees with paraspinal tenderness from C2 to C5. T.158.

Dr. Sirotenko's diagnoses were (1) degenerative joint disease at the cervical spine with referred pain to the left shoulder; and (2) history of depression and anxiety. T.159. For his medical source statement, Dr. Sirotenko noted as follows:

> Regarding her cervical spine, avoidance of forward flexion, extension and rotation on a repetitive basis. Regarding her upper extremities avoidance of utilizing her hands in an overhead fashion, reaching behind her head or her back. Regarding her depression and anxiety, consideration of, a formal psychiatric or psychological evaluation may be warranted. She would be able to push, pull lift objects of a moderate degree of weight on an intermittent basis. She should avoid lifting objects over her head to prevent cervical load. She does not require the use of an assistive or supportive device. No limitations regarding fine motor activity. No limitations regarding lower extremities.

T.159.

On January 8, 2005, Plaintiff was examined by consultative psychologist Christine Ransom, Ph.D. T.180-183. Plaintiff was currently being treated by her primary care physician for panic attacks, which have improved on medication. She has been having

them her whole life; she gets about 1 per week. T.180. She was able to do grocery

shopping but needs assistance with cleaning and laundry due to neck pain. She does not drive a car in the winter as she does not have the strength due to injury. T.182. On examination, Plaintiff's attention and concentration were intact, as were her immediate and remote memory. T.181. For her medical source statement, Dr. Ransom stated that Plaintiff can follow and understand simple directions and instructions; perform simple, rote tasks; maintain attention and concentration for simple tasks; consistently perform simple tasks and learn simple new tasks; perform complex tasks independently; make appropriate decisions; relate adequately with others and appropriately deal with stress. T.182. Dr. Ransom's Axis I diagnosis was panic disorder without agoraphobia, currently with mild residual symptomatology. T.182.

On January 27, 2005, Plaintiff's medical records were reviewed by Janis A. Dale, M.D., a State agency review physician, for completion of a residual functional capacity ("RFC"). T.184-89; 179. Dr. Dale assessed that Plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds, sit for 6 hours in an 8-hour workday, and stand/walk for 6 hours in an 8-hour workday. T.185. Plaintiff was limited in upper extremities with regard to her abilities of pushing and pulling (although Dr. Dale did not indicate nature and degree of the limitation. T.185. According to

Dr. Dale found that Plaintiff had no postural or manipulative limitations (including reaching all directions (including overhead), handling (gross manipulation), and fingering (fine manipulation). T.186. She stated that Plaintiff's statement of disability is credible but not to the degree alleged; "objective findings on exam reveal good strength, good [range of motion] and no problems with manipulation". T.187-88. In summary, Dr. Dale indicated that Plaintiff is capable of "light RFC with occasional restricted repetitive movements of the hands." T.188.

### 2. After the Date Last Insured (June 30, 2005, to Present)

On February 13, 2007, Plaintiff began counseling at Salamanca Counseling Center for her ongoing anxiety and depression. T.515-21.

On August 29, 2007, Mary Kolbert, M.D., a family care practitioner affiliated with the Lifetime Health Medical Group, noted that Plaintiff had been diagnosed recently with diabetes and hypercholesterolemia. She had a history of anxiety for which she was taking Lexapro and Clonopin; previously she had been on Effexor. T.474-475, 477.

On April 7, 2008, Plaintiff saw neurosurgeon John Pollina, M.D., for her neck pain, left-shoulder pain, and numbness and tingling in her left hand, which had commenced after her April 2003 motorcycle accident. T.403. She rated her pain as a 10/10 on the visual analog scale. She was using Cymbalta and some Xanax for overall symptoms. On examination, Plaintiff had pain with cervical

-12-

spine range of motion; intact strength in all four extremities; decreased pinprick in the left arm and left hand, with no specific dermatomal pattern. T.404. Dr. Pollina requested another MRI of the cervical spine. His diagnoses were cervical radiculopathy, history of cervical disc herniation, and neck pain. T.404.

On April 7, 2009, at Dr. Kolbert's referral, Jeanne Salada-Conroy, RNP-C ("Nurse Salada-Conroy") of Suburban Psychiatric Associates ("SPA") performed a psychiatric evaluation of Plaintiff to determine whether she was a good candidate for lapband surgery. T.489-92. Nurse Salada-Conroy noted that Plaintiff had seen Dr. Sameron for depression in 2006. Nurse Salada-Conroy cleared Plaintiff for surgery. T.491. She continued to return to SPA in the subsequent months and years for talk-therapy sessions with Nurse Salada-Conroy for her anxiety and depression. T.493-506. Nurse Salada-Conroy completed a Psychiatric Report on June 23, 2010, finding that Plaintiff had marked difficulties in numerous areas of maintaining social functioning; difficulties in task performance and concentration; and many indicators of decompansation or deterioration in stressful situations. T.507-09.

On April 22, 2009, Plaintiff was referred to neurosurgeon Dr. Bennett by her primary care physician for neck pain and left arm weakness. T.405. Dr. Bennett noted that the neck pain is localized to the posterior and left lateral cervical region and has been present for 5 years. It is 10/10 in severity and radiates into

-13-

the left C6 and C7 distribution. The pain is described as being
constant and generally following no specific pattern. Plaintiff
reported the pain is aggravated by bending and alleviated by rest.
Dr. Bennett noted that the left upper extremity weakness has been
present for 5 years and is not improving.   T.405. Dr. Bennett
ordered an MRI of the cervical spine. T.408.

On August 19, 2009, and March 10, 2010, Dr. Bennett noted that
Plaintiff's neck pain continued to be localized to the posterior
cervical. It was moderate (3-6/10) in severity and does not
radiate. The pain is described as being intermittent and it is
generally following no specific pattern. She also reported left arm
numbness. T.409, 413. In August, she told Dr. Bennett that she
continued to have numbness, but denied arm weakness. T.409.

On July 20, 2010, Plaintiff saw orthopedist Edward D. Simmons,
M.D., for her neck pain, headaches, and arm numbness. T.532.
Plaintiff told Dr. Simmons that her symptoms have gotten worse over
time. T.532. Dr. Simmons diagnosed her with cervicalgia and ordered
an updated MRI. T.534.

The result of the August 9, 2010, MRI of Plaintiff's cervical
spine revealed disc herniations at C4-C5, C5-C6, C6-C7; a probable
herniation at T4-T5; an angular bulge at C3-C4; and stenosis at
C4-C5, C5-C6, and C6-C7. T.537. Dr. Simmons reviewed the MRI
results on the same day and found that the results correlated with
his clinical findings. T.529.

-14-

### B.   Plaintiff's Testimony

Patient reported that she had been injured on April 20, 2003, when she was catapulted off her motorcycle while kick-starting it. She landed on her left shoulder and sustained injuries to her shoulder and neck. T.545. She testified that since then, she gets "massive headaches" and "numbness in [her] left arm, basically all the time." Id. She used to drive a school bus, but she no longer drives because she has "no strength" and some of her medications make her "real sleepy, dizzy" and have blurred vision. T.550. She currently was being treated for anxiety and depression; she stated that she cannot be in crowds because she feels as though she is going to pass out; her hands get clammy and sweaty, and her whole body starts to shake. T.553-54.

During the period from July 2003, through June 2005, Plaintiff lived with her husband and their adopted son and adopted daughter.[2] Her husband did the cooking, cleaning, and shopping. T.555. Plaintiff was unable to lift her daughter at age two years. Id. Plaintiff had a license but was unable to drive. T.556.

Her previous work was as a bus driver, transporting handicapped children who attended a preschool learning center. T.556. After her accident, she was unable to return to that job

---

[2]

The other adopted son had been taken into the care of the State because it was discovered that he was sexually molesting Plaintiff's adopted daughter.

because it was too strenuous (she had to load and unload the children from the bus). T.557.

Following the accident, she initially could not move her left arm at all. Now, she can move it a little bit but cannot lift it above her head. She continually has had numbness and pain in that arm. T.557-58. She also has had numbness in both hands "[a]ll the time", worse in the left. T.559, 561. The numbness affects her ability to pick things up; she testified that she picked up a gallon of milk, and it fell out of her hand and broke on the floor. T.561. She uses two hand to pick up a coffee cup, and her hands shake while holding it. T.561. She does not wear clothing that has buttons or zippers.  T.561. For her neck spasms, she has tried Soma, Flexeril, Robaxin, and Lortab, but their efficacy was not good, and the side effects were severe. T.560. Flexeril does help her to sleep a little, but she "can't think or . . . talk" while taking it. T.560. She testified that she gets neck spasms about 10 times a day, and they sometimes last an hour. T.560-61. She testified that she would try to do the dishes, but after about five minutes she would have to sit down for about 45 minutes to an hour because she would have a severe headache, and numbness with shooting pains down her arms and across her chest. T.562.

The ALJ cross-examined Plaintiff about her medications, asking her "why are you taking them [themedications] if they cause these side effects [sleepy, dizzy, blurred vision]?" T.567. Plaintiff

explained that if she did not take them, she "would be in bed laying [down] all the time. . . ." T.567. She testified that she cannot hold a book in her hands to read her daughter a story; the book has to be set on the table. Because of the side effects of her medications, she "maybe" can read one chapter and definitely cannot read her a full book. T.567.

### C.   The Vocational Expert's Testimony

Vocational expert Don Schader ("The VE") testified via telephone, that Plaintiff's past relevant work as a driver (Dictionary of Occupational Titles ("DOT") 913.663-018) was classified as medium exertion, SVP of 3.  T.572-73. The ALJ then presented the VE with a hypothetical individual who was limited to the sedentary range exertionally and who could not overhead reach or lift with her non-dominant extremity; would have to avoid repetitive turning of the head in all directions; and could "occasionally, as that's defined, understand, remember and carry out complex and detailed [sic] and occasionally interact with the public." T.573. The only job that such an individual could do was "eyeglass frame polisher", DOT 713.684-038, SVP of 2. T.574, 575. The number of these positions nationally was 30,580; and number of positions in western New York was 70. T.574.

Attorney Clary took the same hypothetical individual, with the added limitation that she "could only occasionally handle or manipulate objects with her hands secondary to numbness[.]" The VE

testified the individual would not be able to perform the job of
eyeglass frame polisher because it involved "a constant use of her
hands." T.576.

Because the first records of Plaintiff seeing a psychologist
for her anxiety and depression were not until 2007, after the date
last insured, the ALJ deleted from his first hypothetical the
limitations having to do with understanding, remembering and
carrying out complex
and detailed tasks and interacting with the public. T.578-79. The
VE testified, "I think that person . . . could work as a telephone
survey worker[,]" DOT 205.367-054, SVP 2, national numbers 215,
930, western New York numbers, 750. T.579. The VE testified, "I
think with that type of example these are illustrative" rather than
exclusive. T.580.

Attorney Clary asked the VE if adding the limitation of
occasional fingering or handling with the hands made a difference
to his answer, and the VE replied that it did not. Attorney Clary
then re-examined Plaintiff about her ability to hold onto objects
before her hands go numb. T.580-81. Plaintiff testified that she
was unable to hold onto something for "even a minute" and that she
cannot talk on the telephone because her hand goes numb if tries to
hold the receiver, and she "can't put it up that far to [her] ear."
T.581. Plaintiff explained that they had a speaker phone at her
house. T.581.

-18-

Upon questioning by Attorney Clary, the VE testified that the limitation of being unable to hold an object, such as a telephone, for more than a few minutes, would "[n]ot necessarily" affect his answers because "typically" telephone survey operators "don't . . . have to pick up the phone and hold it to their ear." T.581. The VE testified that such a job probably would be more typing and using a computer than writing by hand. Attorney Clary asked the VE to include the limitation of being only occasionally able to manipulate with the fingers on both hands and asked if that would have any effect on the individual's ability to type as needed for the telephone operator jobs described. T.582. The VE testified that such jobs "require more than the frequent, [sic], it'd be almost constant." T.583. Therefore, if the person could only do occasional manipulation with the fingers on both hands, the hypothetical individual would not be able to do those jobs. T.583.

## IV.  Standard of Review

This Court's function is not to determine de novo whether a claimant is disabled, Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (citation omitted), but rather to evaluate whether the Commissioner applied the correct legal standard in making the determination and, if so, whether such determination is supported by substantial evidence in the record. E.g., Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g); Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998)).

This Court must independently determine if the Commissioner applied the correct legal standards in determining that the claimant is not disabled. See Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984). "Failure to apply the correct legal standards is grounds for reversal." Id. Therefore, this Court first reviews the Commissioner's application of the pertinent legal standards, and then, if the standards were correctly applied, considers the substantiality of the evidence. See Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987) (stating that "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles").

## V.   Eligibility for DIB

To establish disability under the Act, a claimant bears the burden of demonstrating (1) that she has been unable to engage in substantial gainful activity by reason of a physical or mental impairment that has lasted or could have been expected to last for a continuous period of at least twelve months, and (2) that the existence of such impairment has been demonstrated by evidence supported by medically acceptable clinical and laboratory techniques. 42 U.S.C. § 1382c(a)(3); see also Barnhart v. Walton, 535 U.S. 212, 215 (2002).

The statute further requires that an individual will be determined to be under a disability "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). To adjudicate disability claims, the Commissioner utilizes the five-step sequential evaluation set forth at 20 C.F.R. § 404.1520. See also, e.g., Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995).

## VI.  The ALJ's Decision

Applying the five-step sequential evaluation set out in 20 C.F.R. §§ 404.1520, the ALJ determined at the first step that Plaintiff met the insured status requirements through June 30, 2005, and had not engaged in substantial gainful activity since, the alleged onset date.

At step two, the ALJ determined that Plaintiff had the severe impairments of "neck and shoulder injuries" through the date last insured. T.348. He found that Plaintiff also has or may have the following "non-severe" impairments: mild panic disorder, diabetes mellitus and asthma. T.348-49.[3]

---

[3]

In her motion for judgment on the pleadings, Plaintiff does not challenge ALJ McGuan's step two severity determination.

At step three, ALJ McGuan found that through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. T.349 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). The ALJ specifically considered listings 1.02(B) (Major dysfunction of a joint, with involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c) and 1.04(A)-(C) (Disorders of the spine, resulting in compromise of a nerve root or the spinal cord, with evidence of nerve root compression, or spinal arachnoiditis, or lumbar spinal stenosis). ALJ McGuan found that the medical evidence did not establish that Plaintiff has an impairment or combination thereof that "meets, equals, or even remotely approaches the level of severity required by section 1.04(A-C)" T.350. With regard to Listing 1.02(B), the ALJ found that there "were no limitations regarding fine motor activity and no limitations in the lower extremities at the consultative examination." T.350. Moreover, Plaintiff was "able to do activities of daily living and care for an infant in February 2004." T.350 (citing Exhibits ("Ex.") 5F, 7F).

The ALJ then determined that Plaintiff had the residual functional capacity to perform "sedentary work"[4] except with no overhead reaching with the left upper extremity (non-dominate) and avoid repetitive turning of her head in all directions." T.350.

## V.   Discussion of Plaintiff's Contentions

### A.   Failure to Comply with the Appeals Council's Remand Order

Plaintiff contends that ALJ McGuan committed reversible, non-harmless error by disregarding the Appeals Council's directive, in its remand order, to call a medical expert to determine whether Plaintiff met or medically equaled a listed impairment. Specifically, Appeals Council had noted the ambiguity caused by ALJ Harvey's questioning of the medical expert, Dr. Jeremiah Sullivan, at the second hearing, wherein reference was made by both Dr. Sullivan and ALJ Harvey to an outdated section of the Listing of Impairments. The Appeals Council agreed to remand the case "in light of the ambiguity generated by Dr. O'Sullivan's testimony" and ordered the new ALJ to "obtain evidence from a medical expert to clarify whether the Claimant's impairments met or equaled the

---

[4]

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary. See 20 C.F.R. §§ 404.1567(a) and 416.967(a). Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. See id.

severity of an impairment listed in appendix I, subsection P, regulations 4 during the period at issue." T.376-77.

The regulations clearly state that an "administrative law judge *shall* take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b) (emphasis supplied). The failure of an ALJ to abide by the directives in an Appeals Council remand order constitutes legal error requiring remand. Savino v. Astrue, No. 07-CV-4233(DLI), 2009 WL 2045397, at *9 (E.D.N.Y. July 8, 2009) (citing Scott v. Barnhart, 592 F. Supp.2d 360, 371 (W.D.N.Y. 2009) ("The ALJ's failure to comply with the Appeals Council's order constitutes legal error, and necessitates a remand.") (citations omitted); Mann v. Chater, No. 95 CIV. 2997(SS), 1997 WL 363592, at *1-2 (S.D.N.Y. June 30, 1997) (holding that the case must be remanded when the ALJ did not follow the orders of the Appeals Council)).

Not only is the ALJ's refusal to comply with the Appeals Council erroneous as a matter of law, it precludes a finding by this Court that ALJ McGuan could adjudicate Plaintiff's claim with the impartiality required of him under law. Clearly, ALJ McGuan harbors a particular bias towards Dr. O'Sullivan because he believes that Dr. O'Sullivan is predisposed to find that all claimants meet or equal a listing. ALJ McGuan's refusal to call Dr. O'Sullivan implies that the ALJ was not prepared to accept any

expert testimony in her favor. As Plaintiff points out, ALJ McGuan obtained a vocational expert who testified at the hearing *by telephone* from Syracuse. Given the technologies currently utilized to conduct disability hearings remotely, and the database of experts available to the Administration, ALJ McGuan's assertion that Dr. O'Sullivan was "the only" medical expert available to him simply is not plausible. It appears to this Court that the ALJ did not wish to call Dr. O'Sullivan or seek out another medical expert because he wanted to avoid the possibility of receiving evidence that would be favorable to Plaintiff.

Finally, the Court notes with disapproval the Appeals Council's failure to ensure that its own directives were followed. Instead of reviewing the remand hearing transcript, the Appeals Council simply issued a standard form letter to Plaintiff declining jurisdiction. "A more thorough follow-up may well have precluded the need for the instant action." Zavadil v. Astrue, No. 08-CV-4231 (DLI), 2010 WL 3924708, at *6 (E.D.N.Y. Sept. 29, 2010).

**B.   Lack of Substantial Evidence to Support the ALJ's RFC Assessment**

A claimant's residual functional capacity ("RFC") is defined as "the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR

96-8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)). The ALJ's RFC assessment must include a discussion of the claimant's physical and mental abilities, pain, symptomatology, and other limitations on the claimant's ability to perform work-related activities for "8 hours a day, for 5 days a week, or an equivalent work schedule." Id.; see 20 C.F.R. § 404.1545(a).

As noted above, ALJ McGuan found that Plaintiff "had the residual functional capacity for sedentary work" as defined in 20 C.F.R. § 404.1567(a), "except with no overhead reaching with the left upper extremity (nondominant) and avoid[ance of] repetitive turning of her head in all directions." T.350. Plaintiff contends that ALJ McGuan omitted a significant limitation on her ability to perform repetitive hand movements and mischaracterized one of her physician's statements about her limitations. The Court addresses these contentions in turn below.

### 1. Failure to Include Limitation on Repetitive Movements of Hands

Here, as noted above, the ALJ limited Plaintiff to sedentary work. Due to the nature of most sedentary jobs, the assessment of whether a claimant can perform them necessarily focuses on the upper extremities and hands. See Social Security Ruling ("S.S.R.") 96-9p, 1996 WL 374185, at *3, *8 (S.S.A. 1996) ("Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small objects require use of the fingers; e.g., to pick or pinch. Most unskilled

sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.").

It is well-settled that "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Social Security Ruling ("S.S.R.") 96-8p, 1996 WL 374184, at *7 (S.S.A.). Although the ALJ is required to discuss every complaint raised by the claimant in the medical record, he must specifically address limitations or conditions for which there is substantial record evidence. See, e.g., Mason v. Barnhart, 96 F. App'x 30, 31-32 (2d Cir. 2004) (remanding with instructions to ALJ to specifically address "substantial evidence" in the record that claimant suffered from carpel tunnel syndrome; e.g., ALJ noted one doctor's finding that claimant's wrist wasn't swollen, warm, or tender, but he did not address other finding that claimant had "decreased pinch and grasp" strength).

The ALJ stated that "[t]he medical evidence . . . establishes that the claimant has a long history of complaints of neck pain, upper extremity pain with numbness and weakness." T.358. Indeed, as Dr. Pollina noted in 2008, Plaintiff's neck pain, left-shoulder pain, and numbness and tingling in her left hand "commenced after her April 2003 motorcycle accident." Notably, review physician, Dr. Dale, opined that Plaintiff had the RFC for light (as opposed to

sedentary) work with "occasional restricted repetitive movement of the hands". T.187-88. Without giving any explanation for doing so, ALJ McGuan ignored this aspect of Dr. Dale's opinion, as well as substantial evidence in the record supporting the conclusion that Plaintiff has restrictions on the repetitive movement of her hands. Medical expert Dr. O'Sullivan testified at the previous hearing that Plaintiff suffers from severe arthritis, disc disease and stenosis in her cervical spine. Dr. O'Sullivan asked Plaintiff if repetitive motion of her arms resulted in numbness, weakness, and increased pain in her arms, to which Plaintiff responded affirmatively.[5] Dr. O'Sullivan stated that he was not surprised as this was a result of the stenosis. In his opinion, Plaintiff's physicians did not pay enough attention to this diagnosis. Dr. O'Sullivan's opinion is supported diagnostic tests, such as the June 3, 2003, in which radiologist Jan S. Najdzionek, M.D. found evidence of spinal stenosis, posterior spondylitic ridging, and narrowing of the neural foramina, most prominently on the right at C5-6 and bilaterally at C6-7. T.117.[6] Dr. O'Sullivan noted that the

---

[5]

See T.323 ("M[edical] E[xpert] [Dr. O'Sullivan]: Mrs. Ellis, I have a question for you. If you had repetitive movements of your hands over a period of minutes, what happens? CLMT: My hands go numb. I have no feeling in my hands and my fingers. It's like someone shot them up with Novocain. ME: Okay. I was expecting that.").

[6]

Review physician Dr. Dale acknowledged and purportedly relied on the 2003 MRI findings of multilevel degenerative disc disease and spinal stenosis in formulating her RFC assessment, which

November 20, 2004 MRI "show[ed] the same thing." T.323-24.
Furthermore, Dr. O'Sullivan observed in Dr. Bennett's February 13,
2004 report clinical findings "to go along with this [cervical
stenosis] too[,]" T.324, namely, spasm of her trapezius, and
diminished motion in both arms. Id. Dr. O'Sullivan characterized
the "cervical stenosis of [Plaintiff's] hands" as "pretty severe."
T.325. The fact that Dr. O'Sullivan and ALJ Harvey referred to an
outdated Social Security handbook and an obsolete listing when
discussing Plaintiff's impairments does not negate or undermine
Dr. O'Sullivan's observations, detailed above, which were based on
his review of the medical evidence and Plaintiff's subjective
symptoms. Had ALJ McGuan complied with the Appeals Council's remand
order, Dr. O'Sullivan would have appeared at the third hearing and
offered substantially the same testimony. As noted above, ALJ
McGuan's reason for declining to call Dr. O'Sullivan was patently
arbitrary.

The ALJ's failure to incorporate a restriction on repetitive
hand movements into his RFC assessment was not harmless error.
Attorney Clary's questioning of the VE makes that clear. See T.576-
83. As set forth in the summary of the VE's testimony, the addition
of a restriction on the repetitive use of the hands to each of the
hypotheticals posed by the ALJ resulted in the VE testifying that
such an individual could not perform any of the jobs in question.

included a restriction on repetitive hand movements.

-29-

That is to say, Plaintiff's non-exertional limitations with regard to her use of her hands completely eroded the occupational base for sedentary jobs that the VE testified that she could perform.

### 2. Mischaracterization of the Record

Plaintiff also argues that ALJ McGuan mischaracterized statements by treating physician Dr. Bennett regarding his opinion as to Plaintiff's ability to return to work. The Court agrees.

In attempting to buttress his RFC assessment, ALJ McGuan stated that neurologist Dr. Bennett said "she could not 'return to work' at various times and said she *could do light work*[,] both of which are consistent with the residual functional capacity found, as her past relevant work was medium and his opinion of light work would give her more ability to do more jobs than what [the ALJ] found." T.359 (emphasis supplied). This is a gross mischaracterization of the record. What Dr. Bennett actually said was that he "*anticipated* an *eventual* return" to light work or, simply, to work of an unspecified exertional level. These remarks describing his *expected* course of her recovery were made less than six months after her injury. Significantly, Dr. Bennett never released her to return to her previous job, and he never stated that Plaintiff *actually could perform* the requirements of light or other work. As the medical records demonstrate, Plaintiff never reached that level of functionality. It was plainly improper for the ALJ to bolster his own RFC assessment with a blatant

-30-

misstatement of the record.  See Richardson v. Barnhart, 443 F. Supp.2d 411, (W.D.N.Y. 2006) ("The ALJ's statement that 'Dr. Donahue has provided no objective medical evidence to support her statement of disability,' is a gross mischaracterization of the contents of the record. The ALJ's mischaracterization is indicative that his analysis is not based upon substantial evidence."); Aragon-Lemus v. Barnhart, 280 F. Supp.2d 62, 70 (W.D.N.Y. 2003) (finding the ALJ's credibility analysis not supported by substantial evidence in part because the ALJ mischaracterized the plaintiff's testimony); Edel v. Astrue, No. 6:06-CV-0440 LEK/VEB, 2009 WL 890667, at *17 (N.D.N.Y. Mar. 30 2009) (similar).

## VI. Remedy

A reviewing court has the authority to reverse with or without remand. 42 U.S.C. §§ 405(g), 1383(c)(3) (2003). Reversal without remand is appropriate when there is "persuasive proof of disability" in the record and further proceedings would be of no use. Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980). As discussed above, the ALJ acted arbitrarily and capriciously in flouting the Appeals Council's remand order and declining to call a medical expert. He also made significant errors of fact and misapplications of law insofar as he ignored substantial evidence of Plaintiff's limitations on her use of her hands, and mischaracterized Dr. Bennett's statements about her prognosis. Only by virtue of these errors could the ALJ arrive at an RFC that

allowed him to find Plaintiff capable of sedentary work with restrictions. Remand solely for the calculation of benefits is appropriate where, as here, "application of the correct legal principles to the record could lead to only one conclusion," DeJesus v. Chater, 899 F. Supp. 1171, 1179 (S.D.N.Y. 1995), namely, that Plaintiff is disabled for purposes of the Act.

## VII. Conclusion

For the foregoing reasons, Defendant's motion for judgment on the pleadings (Dkt #13) is denied, and Plaintiff's motion for judgment on the pleadings (Dkt #11) is granted. The Commissioner's decision is reversed, and the matter is remanded for calculation and payment of benefits.

**SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    June 30, 2014
          Rochester, New York